# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LINDA COOPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 12-cv-561-TLW |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Linda Cooper seeks judicial review of the decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3). In accordance with 28 U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before a United States Magistrate Judge. (Dkt. # 6). Any appeal of this decision will be directly to the Tenth Circuit Court of Appeals.

## Introduction

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

---

[1] Effective February 14, 2013, pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750-752 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by substantial evidence, and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the administrative law judge's ("ALJ") findings in order to determine if the substantiality test has been met." Id. at 1262. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached

a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## Background

Plaintiff, then a 38-year old female, applied for Title II benefits on September 29, 2008 and Title XVI benefits on October 20, 2008, both applications alleging a disability onset date of October 3, 2007. (R. 120-130, 131-133). Plaintiff's last insured date under Title II was determined to be March 31, 2011. (R. 14). Plaintiff initially alleged that she was unable to work due to back problems, stomach problems, chronic pain, depression, and side effects from medications. (R. 161). On a "Disability Report – Appeals" form, she noted that she "could hardly walk; inside of my thighs burn; my feet hurt; my left side of my back is hurting; both my knees are weak; night sweats; pain in feet, legs, & back is worse. High blood sugar; ear infections; having trouble hearing; I don't remember things; … I forget dates; vision problems when on Lyrica. Problems with stomach due to medications. … I am using a walker." (R. 203). She also reported new "mood swings; panic attacks; insomnia; depression is worse. Can't concentrate to read a book," and trouble carrying on a conversation. Id. She claimed these changes occurred in October 2008. Id. Plaintiff's claims for benefits were denied initially on March 9, 2009, and on reconsideration on June 1, 2009. (R. 70-74, 78-83). Plaintiff then requested a hearing before an ALJ. (R. 84). The ALJ held a hearing on March 4, 2010. (R. 33-64). The ALJ issued a decision on April 30, 2010, denying benefits and finding plaintiff not disabled. (R. 11-32). The Appeals Council denied review, and plaintiff appealed. (R. 1-5).

## The ALJ's Decision

The ALJ found that plaintiff was insured through March 31, 2011, and had performed no substantial gainful activity since October 3, 2007, her alleged onset date. (R. 16). The ALJ found that plaintiff had the severe impairment of "degenerative disc disease of the lumbar spine, status

post surgery." Id. The ALJ performed the "special technique" to evaluate plaintiff's non-severe mental impairments of adjustment disorder and panic disorder, and concluded that she only had mild limitation in each of the first three functional areas and no episodes of decompensation. (R. 16-18). Plaintiff's impairments did not meet or medically equal a listed impairment, with special consideration given to Listing 1.04, disorders of the spine. (R. 18). The ALJ then reviewed the medical evidence, plaintiff's testimony, and other evidence to determine plaintiff's residual functional capacity. (R. 18-24).

Although plaintiff could not remember why she did not work in 1995 to 1996, she testified that in 1998 she worked for Express Services (a temporary employment agency) at "Tyco Plastics or Red Devil." (R. 19). Her employment duties at Tyco included cutting cardboard cores and stocking them for line workers, and at Red Devil her duties included packing boxes. She said she went to school after working at Tyco, and left Red Devil because they asked her to work nights, which she could not do because of her children. Id. Plaintiff said she was self-employed in 1991, 2000-2002, and 2005-2006. During those times, she cleaned houses, did some roofing work, and helped frame houses. She performed some cashier and stocking duties for a short time at Wal-Mart before being promoted to customer service. She said she was on her feet all day. Id. After Wal-Mart, plaintiff returned to the temporary service and worked for "carbide," where she had to lift approximately 100 pounds "a couple of times a week." Id. Lastly, she worked for Dollar General, but only stayed there for approximately six weeks because she said that her legs and foot started going numb, and she could not handle "the stress, panic attacks, and pain." Id.

Plaintiff stated that she was involved in a motor vehicle accident in October 2007 in which she sustained injuries to her lower back and right leg. Id. After physical therapy, injections, a discogram, and back surgery, plaintiff experienced brief relief from her pain, but is

4

experiencing more problems now. Id. Plaintiff claimed that she is able to stand for approximately 10 to 15 minutes at a time, but cannot walk longer than 30 minutes to an hour if she can hold a cart. She completely avoids stairs, and walks with a right sided limp. Id. Plaintiff also reported stomach problems, and said she was referred to pain management. Id. She stated panic attacks, present before her auto accident, have increased. She said she takes Lexapro and Xanax, which lessen the effects of the panic attacks, but do not eliminate them. Stressful situations increase the panic attacks. Id.

Plaintiff's mother, Dorothy Cooper, submitted a Third Party Function Report on January 23, 2009, which the ALJ summarized. Id. Ms. Cooper said that she does not see plaintiff daily, or all day, but claimed that plaintiff "is in bed 'a lot,'" does "very little housework and cooks very little." Id. Ms. Cooper said that plaintiff must have someone at her home to take a shower and rarely washes her hair. Ms. Cooper stated that plaintiff's children "do 95 percent of the housework," that plaintiff does shop for food and household items once or twice a week (with a wheelchair), that she is able to pay bills, count change, handle a savings account, and use a checkbook and money orders. Id. Ms. Cooper said that her daughter "watches TV all the time, talks on the phone daily, and goes to the doctor, but she does not participate in social activities," and added that plaintiff "has become very withdrawn and antisocial." Id.

The ALJ set forth the SSR 96-7p credibility factors, stating that plaintiff's activities of daily living were "shown above," that she experienced "pain in her low back, which radiates into her right leg," that "sitting or standing for long periods" precipitate and aggravate the symptoms, listed the names, dosages, and reasons for plaintiff's medications, noted that plaintiff "had physical therapy, injections, epidural steroid injections, and surgery" as treatments other than medication, that other methods to relieve pain included lying down, and noted no other factors concerning plaintiff's functional limitations and restrictions due to pain. (R. 20-21).

The ALJ then reviewed plaintiff's medical records. An MRI of plaintiff's lumbar spine dated October 24, 2007 showed "a right parasagittal to lateral disc protrusion with asymmetric right lateral recess and neural foraminal stenosis; broad-based annular or disc bulging at L4-5 with asymmetric right parasagittal to lateral annular or disc protrusion and asymmetric right neural foraminal stenosis inferiorly; and mild degenerative disc disease changes of the lower lumbar spine (Exhibit 3F)." Another MRI dated August 9, 2008 showed a "mild eccentric disc bulge at L5-S1 contacting but not displacing the right L5 and S1 nerve roots with no central canal or foraminal stenosis. There was some mild facet osteoarthritis (Exhibit 12F)." (R. 21).

Plaintiff visited her primary care physician, Paul E. Battles, D.O., on August 28, 2008 with complaints of chronic back pain. Dr. Battles noted the MRI results, and plaintiff's treatment by a back specialist. He noted no improvement in her pain from physical therapy or back injections. Dr. Battles noted plaintiff's reports of severe pain radiating down her right leg, and her need to change position or lie down every 15 minutes to control her pain. Id. Dr. Battles stated that plaintiff was "probably totally [disabled] as there had not been any improvement in almost a year's time." Id.

Plaintiff visited Jean Bernard, M.D. of The Orthopaedic Center on September 11, 2008 for a follow up examination. Plaintiff reported extreme pain radiating to the right side with numbness, tingling, and burning. She said her last injection did not help the pain at all. Physical examination showed no sensory or focal motor deficits, strength was 5/5 bilaterally on all upper and lower extremities, and a straight leg raise test was positive on the right at 60 degrees. Dr. Bernard opined that plaintiff experienced "low back pain secondary to a disc bulge at L4-5 but not displacing L5 and S1 on the right and facet arthropathy L4-5 and L5-S1." Id. Since plaintiff reported some lessening of pain after receiving her last lumbar epidural steroid injection, Dr. Bernard gave her an additional injection at the October 9, 2008 visit.

On February 10, 2009, plaintiff received a physical consultative examination from Traci L. Carney, D.O. Id. Plaintiff reported the same pain symptoms reported to Dr. Bernard stemming from the wreck in October 2007. Physical examination by Dr. Carney revealed plaintiff's heel and toe walking were normal, her tandem gait was normal, she had decreased range of motion in lumbar extension, left lateral flexion, and right lateral flexion (all to 10 degrees), she had pain with all range of motion in her back, and straight leg raising was positive bilaterally in both the sitting and supine positions. (R. 21-22). Plaintiff's gait was safe and stable with appropriate speed with no assistive devices. Dr. Carney noted no muscle atrophy, and assessed plaintiff with "low back pain with radiculopathy and a history of disc disease and anxiety and was on medication for anxiety and depression." (R. 22).

On February 14, 2009, plaintiff presented to Beth Jeffries, Ph.D. for a psychiatric consultative examination. Id. Dr. Jeffries noted that plaintiff's father drove her to the exam, although plaintiff possessed a valid license and was able to drive. Plaintiff reported living with her two teenage children, and that since her accident, she has fought depression. Id. Her appearance was well kept; she walked without help or apparent pain. Id. She reported showering every other day and that she had no trouble with activities of daily living. Id. She was fully oriented and her IQ was estimated "to be at least greater than 80." Id. After testing, Dr. Jeffries opined that plaintiff suffered "adjustment disorder, depressed reaction; amphetamine abuse, in full remission; and alcohol abuse, in full remission." Id. Dr. Jeffries said that plaintiff's adjustment disorder and depression were both mild, and would not interfere with her ability to perform in social, academic, or work settings. Dr. Jeffries stated that plaintiff would be able to manage her own funds. Id.

Plaintiff visited Dr. Battles again on April 1, 2009. A lumbar MRI performed on March 10, 2009 showed "a mild far posterolateral disc protrusion at L5-S1 (Exhibit 17F)." Id. Aside

from the MRI results, Dr. Battles discussed plaintiff's anxiety and depression, and he adjusted her medications. Id.

Next, plaintiff received a lumbar discogram on May 13, 2009. This test revealed "concordant pain at L5-S1 with right posterolateral annular tear. A post discogram CT scan of the lumbar spine showed right posterolateral annular tearing and intraforaminal herniation at L5-S1 (Exhibit 19F)." Id. After the discogram, plaintiff visited Allan S. Fielding, M.D. of Spine Specialists of Tulsa on referral. The September 28, 2009 visit showed plaintiff to be "quite uncomfortable," with slightly reduced strength on the right side. After reviewing plaintiff's MRI scans, discogram, and CT scan, Dr. Fielding concluded that plaintiff had a disc herniation on the right at the L5-S1 level. He said surgery was an option for her. (R. 22-23). On October 20, 2009, Dr. Fielding performed a right L5-S2 partial hemilaminectomy, medial facetectomy, foraminotomy, and diskectomy. (R. 23).

During a three month follow up visit to Dr. Fielding on January 13, 2010, plaintiff reported that her right leg pain had improved no more than 20 to 30 percent, and that she still had some low back pain. Testing showed active symmetric knee and ankle reflexes, normal strength and sensation, and negative straight leg raise tests. Id. Dr. Fielding released plaintiff from active follow up, and stated that she would have some residual pain and would need ongoing pain management from her primary care physician. Id. She returned to Dr. Battles on January 25, 2010 for a referral to pain management.

On January 7, 2010, plaintiff presented to the emergency room with "diffuse abdominal pain." Id. A CT scan of her abdomen and pelvis was normal. She reported chronic narcotic medication, with a recent change to Norco from Lortab 7.5. Plaintiff was discharged on February 14, 2010. Id.

On February 23, 2010, Dr. Battles completed a medical source statement, stating that plaintiff "could maximum continuously sit before alternating postures standing or walking about 15 minutes. After sitting for the maximum continuous period, she would need to alternate postures by standing in place or walking about for 15 minutes before returning to a seated position for another maximum continuous interval." Id. He assessed that plaintiff could sit for a cumulative total of two hours during an eight hour work day, that the maximum time she could stand or walk around before needing to sit or lie down was 30 minutes, and that after reaching those maximums, that plaintiff would need to lie down or recline for an hour. He said that the total time she could be on her feet during an eight hour work day would be less than an hour, but noted that she did not need an "assistive device" to walk. She would require "more rest to relieve pain and fatigue arising from a documented medical impairment" than normal breaks scheduled at two hour intervals in an eight hour work day. (R. 23-24). He estimated the total time that plaintiff would need to rest was two to three hours in an eight hour day. Dr. Battles opined that plaintiff could lift up to five pounds frequently, up to ten pounds occasionally, 11 to 50 pounds rarely; she could occasionally balance, stoop, perform forward flexion, backward flexion, right rotation and left rotation, occasionally reach and handle bilaterally, and she could frequently finger with both hands. (R. 24).

The ALJ afforded little credibility to plaintiff's mother's opinion of plaintiff's condition, stating that Ms. Cooper's report was "brief and cumulative and added little to the evaluation of the claimant's allegations," and because Ms. Cooper had a vested financial interest in the outcome of plaintiff's claim. Id.

Dr. Battles' opinion was also given little weight. The ALJ found that Dr. Battles' "own treatment notes do not support that the claimant is as limited as he indicated," and that "[t]he doctor apparently relied quite heavily on the subjective complaints of symptoms and limitations

provided by the claimant, and seemed to accept as true most, if not all, of what the claimant reported." Id. The ALJ did give "great weight" to the State Agency medical consultants' opinions of plaintiff's physical and mental impairments. Plaintiff takes Lexapro and Xanax, prescribed by her primary care physician, but has not received any treatment from a mental health professional. Id. Dr. Jeffries noted only mild impairments which would not interfere with her abilities to work. As to plaintiff's physical impairments, three months after her surgery on October 20, 2009, plaintiff exhibited only mild findings, including negative straight leg raise testing and normal strength and sensation. Id.

The ALJ concluded that plaintiff did continue to suffer "some back pain" since her surgery, but noted that limiting her to "a limited range of light work should reasonably be expected to limit aggravating her pain. However, the claimant does not have to be entirely pain free in order to perform some type of work activity. Considering all the factors explained above, the multiple findings reported after her surgery continue to be only mild, and are not consistent with the degree of pain and functional loss she currently alleges." Id.

Based on this evidence, the ALJ concluded that plaintiff would have the RFC to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), which includes lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking (with normal breaks) for a total of about 6 hours in an 8-hour workday; sitting (with normal breaks) for a total of about 6 hours in an 8-hour workday; pushing/pulling 20 pounds occasionally and 10 pounds frequently; except for occasional climbing, balancing, stooping, kneeling, crouching, or crawling." (R. 18).

The ALJ then found that plaintiff could not perform any of her past relevant work, explaining that plaintiff's prior jobs were all performed at the medium or heavy levels of exertion. (R. 25). The ALJ classified plaintiff as a younger individual, noted that she possessed

"at least a high school education," and found transferability of job skills not material because the "Grids" support a finding of "not disabled" either way. Id.

Ultimately, after consulting a vocational expert, the ALJ concluded that plaintiff retained the ability to perform the limited light exertion jobs of housekeeping/cleaner (DOT 323.687-014); sales attendant (DOT 299.677-010); and food production (DOT 524.687-018), and therefore, was not disabled under the Social Security Act from October 3, 2007 through the date of her decision. (R. 25-26).

**Additional Medical Records**

After the hearing and subsequent denial, plaintiff submitted additional medical records to the Appeals Council. (R. 699-708, 709-13, 714-17, 718-24, 725-32). These records show some tenderness of plaintiff's lumbar spine with mildly reduced range of motion, depression, and cold and flu symptoms. Several of these records reveal that plaintiff was involved in two additional motor vehicle accidents (in which she was driving), one in June 2010, and another in December 2011, and an assault in August 2010. (R. 704, 706, 715). Dr. Battles prescribed medications, but did not note any severe pain in his treatment notes.

**Issues**

Plaintiff appeals the decision of the ALJ, and asserts that the ALJ incorrectly determined that plaintiff was not disabled. Plaintiff specifically asserts that the ALJ failed to: (1) properly consider plaintiff's treating source opinions; (2) properly determine that plaintiff met Listing 1.04(A); (3) perform a proper credibility analysis; (4) properly consider Dorothy Cooper's Third Party Function report; and (5) properly evaluate plaintiff's physical and mental limitations. (Dkt. # 9).

## Discussion

The Court finds that although the ALJ's credibility determination is well supported by the record, the ALJ's analysis does not comport with the applicable legal standard. The Court finds no other error with the ALJ's decision.

**Credibility**

An ALJ's credibility findings warrant particular deference, because she is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion. White v. Barnhart, 287 F.3d 903, 909 (10th Cir. 2002); Gay v. Sullivan, 986 F.2d 1336, 1341 (10th Cir. 1993). Further, the review of an ALJ's credibility determination is limited, and reweighing the evidence is not permissible. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). As long as the ALJ sets forth the specific evidence relied on in evaluating plaintiff's credibility, the ALJ is not required to make a "formalistic factor-by-factor recitation of the evidence." Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of attempts… to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ… and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler, 68 F.3d at 391 (quoting Hargis v. Sullivan, 945 F.2d 1482, 1489 (10th Cir. 1991)). Finally, "an ALJ's findings with respect to a claimant's credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Hardman v. Barnhart, 362 F.3d at 676, 678-79 (10th Cir. 2004).

The ALJ included a detailed factual recitation of plaintiff's medical history, including plaintiff's testimony, as well as third party reports. However, the ALJ failed to provide any analysis linking these facts with her conclusion that plaintiff's testimony lacked credibility. In

her RFC findings, the ALJ did not incorporate a sit/stand option for plaintiff to change position at will, leaving the Court to speculate whether or not she accepted the listed SSR 96-7p findings as true. The only remaining credibility mention is the final paragraph of the ALJ's detailed decision, which states:

> [t]he claimant does continue to suffer from some back pain since her surgery. Limiting her to a limited range of light work should reasonably be expected to limit aggravating her pain. However, the claimant does not have to be entirely pain free in order to perform some type of work activity. Considering all the factors explained above, the multiple findings reported after her surgery continue to be only mild, and are not consistent with the degree of pain and functional loss she currently alleges."

(R. 24).

The ALJ did not discuss plaintiff's credibility in any meaningful way or link her factual findings to her credibility finding. Although the ALJ cited more than sufficient facts to support her conclusion, the Court is not allowed to provide the necessary link between the facts and the ALJ's finding. Thus, this case must be remanded for the ALJ to revisit her credibility finding.

## Conclusion

The decision of the Commissioner finding plaintiff not disabled is hereby REVERSED in part, and this case is REMANDED for the purpose of allowing the ALJ to make the required analysis between the evidence in her decision and her credibility finding. The Court finds no error with the remainder of the ALJ's decision; however, the ALJ is free to re-evaluate her decision, if she reaches a different conclusion regarding plaintiff's credibility on remand.

SO ORDERED this 21st day of January, 2014.

T. Lane Wilson
United States Magistrate Judge